## T. A. RANDALL v. THE STATE.

No. 15221. Delivered May 11, 1932.
Reported in 49 S. W. (2d) 819.

The opinion states the case.

*J. A. Moyer,* of San Antonio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for robbery; punishment, five years in the penitentiary.

We find in the record two bills of exception, each presenting sup-

posed error dependent upon proof of misconduct of the jury. It was claimed that the jury took into consideration appellant's failure to take the stand and testify. Appellant introduced one juror. After affirming that there was no discussion in the jury room of appellant's failure to testify, the juror said, on direct examination, that he did consider the fact that appellant did not take the stand. On cross-examination this juror said that he based his verdict on the evidence heard and the charge of the court, and that he did not base same on the failure of defendant to testify. On redirect examination he said that he could not understand how a man could be charged with a crime like that and not defend himself by going on the stand. The trial judge asked him the pointed question if he found the verdict on the evidence he heard from the witness stand, based on the law given in the charge, and the witness answered that he did. Appellant cites several authorities on this point. We think appellant misapprehends said authorities. We have thus set out the statement of the juror, but believe it to be the uniform holding of all the courts, including this one, that it is against public policy to permit a juror to impeach his verdict by such testimony as that here given. Many authorities will be found cited under article 753, Vernon's C. C. P., note 51. We are of opinion that the statement of the juror, in effect that it is difficult to see how a man could keep out of his mind some suggestion of guilt as a result of the failure of the accused to take the stand and testify, is probably correct, and this will remain true as long as the statute stands on the books, but in the absence of some discussion of the failure of the accused to testify, or concrete testimony that such facts was used against him, we cannot permit jurors to come before the court and stultify their own verdicts in this fashion.

A rather unusual state of facts is presented. M had $80 in money on his person, which he carried in a little slit in his pants under his belt. He said his business required him to carry cash money with him. On Monday, July 20th, appellant, who had an acquaintance of M, came to the latter and borrowed $10. M, in the presence of appellant, took the $80 out of the place in which he carried it and took therefrom $10 which he let appellant have. The next morning M met a soldier named Woody. He did not know Woody and had never told him where he kept his money, nor had Woody ever seen him take money from under his belt. Appellant was with M when he met Woody, and the two were in a restaurant when Woody came in. When appellant and M left the restaurant Woody followed them. M asked appellant if he knew Woody, and the latter said he did, and that he was a No. 1 character and O K as far as appellant was concerned. They walked some distance, appellant leading the way, and at 117 Monterrey street Woody stuck a knife in M's ribs and said "Let's go in here." They walked into the building, and while in same Woody held his knife on M. When the men running the place

walked out, Woody ordered M to take off his trousers, which he did. Appellant was sitting down some three feet away. M took his trousers off and handed them to Woody, and testified: "He seemed to know where my money was. He merely took this lining and ripped it and took the money out and went into this pocket." Woody then threw the trousers in a corner of the room and walked out. He got $60 and some change. Woody did not take anything from appellant, nor hold appellant up. M testified that appellant was sitting near by looking at him and Woody, and that when he looked at appellant he threw his face down in this position (illustrating) and held it there quite some time, and this seemed to be while the robbery was taking place. M reported the matter to the police, and Woody was arrested. Officers talked to appellant before his arrest, but he refused to make any statement. It was testified to without objection that when arrested Woody made a written statement admitting the robbery, and saying that he was with appellant, and that he and appellant planned to hold M up. The state introduced another witness who said that on the afternoon of the 21st of July, which was the day of the alleged robbery, appellant came to witness' home and wanted to get witness' brother to take him out to Kelly Field "to get his split." He said to witness' brother that he would pay him for his time if he would take him out there, and make it square with him for what he thought it was worth. He said he was going to see Woody. He further testified that appellant was talking about some money when he asked for the car and when he said he would pay witness' brother to take him out there. He said he was going out there to get "his split" and that he "would pay my brother for his time." "My sister would not let him use the car." Appellant did not testify. In our opinion this testimony supported and justified the verdict of guilt.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*